All right. First case to argue this morning, Robert McMichael v. Transocean. Mr. Edelman. Good morning. May it please the Court. The primary issue in this case is whether Robert on the merits when he was terminated, given that he was 59 years of age, he was replaced by a man who was 10 years younger. And on the company's own reduction in force plan, he had a 71%, while the man who replaced him, the younger man, had a 59%. The issue, the determination given by the employer holds water and is consistent with the evidence or is in conflict with both the testimony of the human relations representative and the rig manager. As a general proposition, in these cases where there's a rift, a reduction in force across the board, and I presume you or your client don't dispute that there was an overall reduction in force, right? Correct, Your Honor. All right. That being the case, does that change or alter the typical approach we take, if at all? Well, it adds another factor as to whether or not he was replaced by a younger man. He that in and of itself, it's like it doesn't solve the issue. It's not the fact that there was a reduction in force alone does not justify the termination of Mr. McMichael, because like the court said in Tyler v. Lazy Boy, they have to have a neutral criterion for the actual selection. Well, they did. They had a formula. I'm sorry, Your Honor? I thought they had a formula, ranking and conferences with the supervisors and that sort of thing. They have a formula, a high-grading process, and that's where the issue, that's under that formula, all the written documents show that Mr. McMichael had a 71% and his replacement had a 59%. They try and explain that by saying that after the fact, Ms. Lopez says that Mr. Kennedy told her that he was terminated because he spent too much time in the tool pusher room. Mr. Kennedy says that he has a litany of things, including weak leadership and weak leadership, and by the senior tool pusher that Mr. McMichael was a mediocre tool pusher. Both those scenarios are in conflict with Mr. McMichael's 2014 evaluation, and that's the problem, that they have a formula, but the formula didn't work in this case. Well, didn't the company say that something like almost half of their tool pushers had to be riffed? It was a huge number. It was a huge number, but on the clear leader, where Mr. McMichael was working on the clear leader, they weren't riffed on that particular vessel. Well, that vessel got shelved. Not at the time that Mr. McMichael was terminated. It might have gotten shelved later on, but not then. To me, that's the fundamental problem with their explanation, that it conflicts in different angles, and Mr. Kennedy, when he testified that Mr. McMichael was a mediocre tool pusher, the senior tool pusher said that he was a good tool pusher operating on the night shift, and the OIM man said he had the natural ability to rally crews. Those are diametrically opposed to what Mr. Kennedy testified. What Mr. Kennedy testified was pure hearsay. What do you do with the general rule that a company can make a bad business decision or a business decision founded on incorrect assumptions, and even if these were incorrect, how do you show that there are pretexts for age discrimination? I rely on reads for that, because our position is that they did not articulate a legitimate non-discriminatory reason for Mr. McMichael's termination. I state that the reason they submitted is both it's not a legitimate reason, and it also turns out to be pretextual, because once you strip the reason they gave because of all these conflicts, the conflicts between Ms. Lopez and Mr. Kennedy, and then with the 2014 evaluation, once you strip all that, what you're left with is a 59-year-old man replaced by a 49-year-old man with a lower score on their own formula. That's how we get to that, plus there are these statements of Mr. Owen, the earlier OIM, that Mr. McMichael had nothing to worry about because he was of an age where he could withdraw his money without any kind of IRS penalty. That would be our position on that, that once it's shown that once they're stripped of these explanations because of their conflictual nature, that all you're left with is a classic paradigmatic case of age discrimination, an older man being replaced by a less qualified younger man. Remind me, is there some cutoff in the law as to what constitutes younger? I think it's, yes. I mean, it's been shady, but every case I've read, once you hit the 10-year framework, there are cases that go a lot less, and I realize that can be an issue. I don't really think that's a issue that prohibits Mr. McMichael from recovering in this case should we be allowed to go back to trial. The other thing is that Mr. What's the evidence to show that the decision to hire the replacement was wrong? Was the decision made by a person who was, A, aware of the age differential at all, and the time frame between the time that selection occurred? In other words, how do you make the connection? That's what he said during his deposition, but he also said other things that are not verified in his deposition, in his declaration. I come back to what the facts show. The facts show that he, that Mr. McMichael was replaced by a younger individual, and I take the position that the fact that it was not immediate, it took some time. There was no reason. There's no reason that's ever given. Why would they pluck Mr. McMichael off of the clear leader and then pick another man who was working on the Invictus? It's logically, it doesn't make any sense. That's another question I had, as to how this all worked. I may misunderstand the facts. I thought they took the whole tool pusher population and went through as a universal group and ranked them, and then decided to keep the top people. I was questioning how you could necessarily say it was a one for one, that this person specifically replaced Mr. McMichael when they were just picking out of a whole group. I don't, we never had that evidence that that's how they did it. If they had done that, if that's the way they did it, then, and they had their right, in their exhibits to Mr. Kennedy's deposition, they put out, there's all the ratings, and Mr. McMichael has a 71%, Mr. Eckert has a 59%. So if they did that, if they took all the tool pushers and put them in one big package, and went down, then how do they get to Mr. McMichael? He's got 71%. Well, they say that that was a preliminary number, that they hadn't had all the reports from other people before that they got to the final number. I understand that, but that's, but they could have, they had, if that was true, I mean, they had plenty of time to have that reflected in some written document. Some, if they truly believe, the first time we ever heard about this, 52% from McMichael was in the declaration of Ms. Lopez. It wasn't in her deposition, and Kennedy didn't know any of that. So there's no evidence that they put together all the tool pushers and then went down and then put them in different places. It appears to, it was much more subjective than that, because Mr. Kennedy says that he ranked, he ranked the four tool, he ranked four tool pushers. We submit that isn't even correct, because there were six tool pushers. Well, two were on a different level, I thought. I thought two had more supervisory authority or something. That was Mr. McMichael. He was one, he was the, he was the client tool pusher. He and the other man, Munger, were the client tool pushers. They just, they weren't, they weren't exactly supervisory. They had more responsibility because they had to deal with Chevron, who they were, the rig was working for. And they had to communicate and do these reports every night. So, so really they were, and it's not an academic issue. It goes to show that Mr. Kennedy, who really, he was in Houston at a desk in Houston, and he was on the clear, he was on the clear leader 17 times in 2014. That's less than 1% of the working time. He could not answer any specific question about what went on in that, on that rig. So our position is that they fail on that test. He was over 50 himself, wasn't he? He was. And I understand that the lower court raised that issue. The employer didn't raise it, but the lower court did. But he, but he wasn't the same actor. He wasn't responsible for hiring McMichael. If there are no more questions, I'll reserve the rest of my time. Thank you very much. All right. Mr. Peterson. Thank you. May it please the court. William Peterson on behalf of Diapolese. I think what would be most helpful would be to start with talking through Transocean's economic situation and the high-grading process as it was applied. Speak up. I'm sorry, Your Honor. Between 2014 and 2018, Transocean reduced its offshore drilling fleet by nearly 60%, cold stacking 44 rigs, laying off more than 7,300 employees. Over a four-year period? That was a four-year period. In the first quarter of 2015, that was the period when Transocean laid off nearly 1,000 employees. There were economic pressures driving reductions in headcount. Now, Transocean did not go through and look at its employees on a corporate level. It didn't. It used the high-grading spreadsheet, as our HR manager, Ms. Lopez, explained, to facilitate conversation with the rig managers. The termination decisions were made by each rig manager. But as a result of the cold stacking of these rigs, Transocean was aware that it had a very large pool of employees, a pool of good employees, that it did not have jobs for. So when Mr. Kennedy was consulting with Ms. Lopez, he was looking at the four tool pushers employed on the Discoverer Clearleader. He was aware that Transocean was attempting to these cold-stacked rigs and other changes in the composition of Transocean's workforce. So there was never a company-wide comparison of, we are going to, say, compare Mr. McMichael to Mr. Eckert. Instead, Mr. Kennedy looked only at the tool pushers who were employed on the Discoverer Clearleader. Was he the manager of just the DCL or some others? My understanding is just the manager of the Discoverer Clearleader. And so that's where we think Mr. McMichael first goes astray in comparing himself to Mr. Eckert. There's a factual answer to that, which is we don't think his evidence shows that he was clearly more qualified. But legally, at the pretext stage, facts and a comparison of qualifications can only show that an employer's explanation is pretextual if that comparison  is not a fact. So here, Transocean has consistently said, we never compared Mr. McMichael to Mr. Eckert. We have only compared Mr. McMichael to the other tool pushers on the Discoverer Clearleader. So as a result, any comparison of the qualifications of Mr. McMichael and Mr. Eckert couldn't show pretext in that argument. If Mr. McMichael had wanted to show that that was pretextual, he would have needed to have compared himself to one of the other tool pushers on the Discoverer Clearleader and argued that he was clearly more qualified than one of those tool pushers. That's not an argument that he's made. That's not evidence that he's ever developed. And it's a bit surprising because he knew the other tool pushers on the Discoverer Clearleader. If he were familiar with anyone's performance, you'd think it would have been his fellow co-workers. He had never met Mr. Eckert. He had no personal knowledge about Mr. Eckert's performance. In fact, there was no witness who offered any testimony in this case about Mr. Eckert's qualifications or abilities as a tool pusher. Who's the focused decision maker as such? We've got several affidavits or declarations about his performance and Mr. Kennedy and others and so forth. So who's the decision maker, per se, vis-a-vis knowing or not knowing about Mr. McMichael's age and the replacement? Is there one person who singly, I know it was a company-wide riff, but is there one person who we have to look at to see what they know or didn't know? Yes, Your Honor. It was Mr. Kennedy. He made the decision in consultation with Ms. Lopez, but both Mr. Kennedy and Ms. Lopez made clear that the decision was Mr. Kennedy's. So let me understand this. They made the decision on tool pushers rig by rig, but then they Yes, Your Honor. You might think of it, I suppose, in baseball terms almost as a trade for a player to be named later. He knew there was a pool of tool pushers who would be available to backfill the position. He first made the decision to terminate Mr. McMichael. When was Mr. Eckert identified as his replacement? It's unclear. It's within several weeks afterwards. But Mr. Kennedy was adamant that he did not look at Mr. Eckert or have any information about the employees in this pool at the time he was making the decision to terminate Mr. McMichael. Let me turn briefly while we're talking about Mr. Kennedy to the consistency of the explanation. Let me just say something. When the decision was made to terminate Mr. McMichael, was that independent of any decision that there would or would not be replacements at all, or did those two go in tandem? You follow what I'm saying? I mean, was it a decision, we've got to get rid of all these people, or is tied to it, there was a decision that there would be some replacement? The latter, Your Honor. There was a decision that there would be some replacement for him. As Ms. Lopez explained, an operational rig is staffed with six tool pushers, two senior tool pushers, and then under each of those senior tool pushers, one day tool pusher and one night tool pusher. Now, there is a dispute of fact about this. Mr. McMichael has stated in his declaration that there were truly six non-senior tool pushers on the rig. For the reasons stated by the district court, it's not a material dispute. At best, it shows a mistake in Transocean's termination process, but not a pretext for discrimination. So, I might make sure I understand the process. So, at some level, the company said we have to eliminate X number of tool pusher jobs? At the highest level, the company said we need to cold stack rigs. So, we are taking some of our rigs that are online being used, we have to take them offline. We still have a thousand employees, that's slightly high, but it's roughly that number, who were employed on these rigs. These are good employees who we don't want to terminate, but nonetheless, because their rigs are no longer being used, we don't have a job for them. So, with that knowledge, can we go through the rest of our workforce, look for, again, not bad employees, but the weakest employees who are on existing rigs? How do we know that a lot of those decisions weren't made on the basis of age? For example, the comment, well, he'll be okay because he can start withdrawing his retirement without a penalty. So, that was a comment allegedly made by Mr. Owen. I think you need to look at that in This was not a comment made by Mr. Owen with respect to termination. It was not actually a comment made by Mr. Owen out of the blue. What Mr. McMichael says is that it was in response to an email that Transocean sent about pensions being frozen. This was in July 2014. About pensions being what? Pensions being frozen. And in response to that, his supervisor, Mr. Owen, apparently provided him with some truthful information about Mr. McMichael's pension status. I think it's very difficult in that context to understand it as expressing any discriminatory animus. I'll also note there's no evidence that Mr. Owen was involved in any way with the termination decision for Mr. McMichael. Mr. Owen was not the offshore installation manager at the time of Mr. McMichael's termination, and there's been no suggestion that he had any influence over Mr. Kennedy at the time Mr. Kennedy was making that decision. In terms of the consistency of the explanation that Mr. Kennedy has given for Mr. McMichael's discharge, I think my friend and I disagree a bit about the record. What he was citing there was paragraph 9 of Mr. Kennedy's declaration. You'll see paragraph 9 is record page 342, and the first sentence of that is, I assigned McMichael a score of zero for promotion potential. Recall there are three components that go into the high-grading process. There's performance, that's the last performance review. There's the ranking, which is how the employee currently compares to the other employees in the same position, and there's promotion potential. The promotion potential is what's in paragraph 9 of Mr. Kennedy's declaration. The ranking is what's in paragraphs 5 through 8 of Mr. Kennedy's declaration, and there's no conflict in the test reason that Mr. Kennedy has given for the reason that he ranked Mr. McMichael last among the four tool pushers. Mr. Kennedy was not asked at his deposition why he assigned Mr. McMichael a score of zero for promotion potential. So it's really an apples and oranges. What were the ages of the other three tool pushers? I believe the record shows that they were all between 10 and 20 years younger than Mr. McMichael. With respect to the comparison of Mr. Eckert and Mr. McMichael, even if it were relevant to show the pretext of the decision, as I mentioned, there are three components that go into the high-grading process. The performance, which is calculated from the last performance review, the ranking, and the promotion score. These are then averaged together to come up with a percentage ranking. As Ms. Lopez explained, given how quickly Transocean was moving, different rig managers provided these scores for their employees at different times. The rig manager on the Deepwater Invictus, the rig where Mr. Eckert had been employed, did provide all three scores to Transocean in a way that they could be incorporated into the spreadsheet. Mr. McMichael's rig manager, Mr. Kennedy, did not. He never sent in ranking scores and never sent in promotion scores so that they could be added to the performance score. I think that's undisputed. We can calculate his performance score from his last performance review. He received 61% of the available points on that last performance review and Transocean rated him as a 3 out of 5. That's the fully successful category, which Transocean equated with 80%. When you average the 61% and the 80%, you get 70.5%, which equates to 71%, which is the number that you see on the spreadsheet. We can do the same thing for Mr. Eckert. His performance review is also in the record. Mr. Eckert's last performance review, he received 67% of the total points available and he was rated a 4 out of 5, which Transocean equated to 100% for these purposes. When you average the 67% with the 100%, you get 83.5%, which was the performance component of Mr. Eckert's last performance review. Now, again, there are many things that could be critiqued about the process that Transocean employed here, but the ADA doesn't protect employees against unfair or even arbitrary decisions. It protects them against decisions that are motivated by age discrimination. Of course, you started out by saying that this high-rank process was just a go-by. Well, yes, Your Honor, and that is our primary position. To be clear, I don't think that any comparison between Mr. Eckert and Mr. McMichael is relevant for these purposes, given the explanation that Transocean has consistently given. And I point the Court to Campbell v. Zao Group. It's an unpublished case, but it's a nice illustration of these principles. That was a case where you had job positions being consolidated and the employer, following a reduction in forced policy, simply retained whoever the most senior employee was, regardless of qualifications. The plaintiff attempted to show pretext by comparing his qualifications to the qualifications of the younger employee who was retained. This Court held that that comparison was irrelevant, because it didn't bear on the actual reason that the employer gave. Do you defend the statement of the District Court? This is what got my attention when I was studying. Even if Transocean's stated reason for discharge was unworthy of credence, summary judgment is still appropriate because, quote, there is simply not enough evidence in this case for a jury to reasonably infer that McMichael would not have been terminated but for his age. Yes, Your Honor, I defend it, although defending it is a bit difficult. Reeves tells us that it is possible that you can have a case in which there is a weak issue of fact with respect to pretext and, nonetheless, insufficient evidence for a plaintiff to reach the jury. I will tell you, I've looked. I could not find any cases that the Court found fit within that theoretical window that the Supreme Court opened up. Well, I think that this Court has been reluctant to go through such a theoretical window. I certainly wouldn't urge you to affirm on that basis. I think it's much easier to affirm by holding that to the extent there are issues of fact, they bear on whether Transocean made a mistake in its decision making and not whether that was pretextual. Mr. McMichael has to show that he's more qualified or clearly more qualified than his replacement. He takes issue with the system to say that it was unevenly applied or it had an error in it or whatever. If you look at one set of scores, I had a 72, and then you look at something else, I have a 52, and then if you do the chart. In other words, he, as I understand it, seeks to make his argument that he's, quote, better qualified or more well qualified based on showing a failure in the ranking system itself to get to a fact issue about what's your response to that. In other words, he's saying, first I had a 72, then he said I had a 59, and then you crank in this factor and so forth. If their own system has a defect or is inconsistent, in other words, that I was better qualified than Eckhart. I think that's a bit of an attack on a straw man, because Transocean has never said that on a company-wide basis, Transocean calculated the full composite score for every employee and then had some type of cutoff score where we would retain those employees above it and terminate those employees below it. If Transocean had said that is what we did, then I'd agree, perhaps a failure to follow that process might well be pretextual, but what Transocean's argument explained is that the high-grading score sheet was used to facilitate discussions with the rig manager on a rig-by-rig basis, that Mr. McMichael was only compared against other tool pushers on the same rig, and that Mr. Kennedy never provided these written ranking or performance or potential scores that could have been incorporated into the spreadsheet. So Transocean has simply never made the representations that Mr. McMichael is seeking to falsify. Unless the Court has further questions, I would like to close with one comment from Ms. Lopez's deposition that I think does bear on the significance of this reduction in force, and I apologize if anything I've said today has been critical of Mr. McMichael as a bad employee, because Transocean didn't fire him because of poor performance. It was simply because of the economic circumstances. What Ms. Lopez said at her deposition was Mr. McMichael wasn't a bad employee. I mean, he was a good employee. You know, our other three tool pushers were also, you know, fully successful. We're not saying they were bad employees, but we're in the middle of laying off thousands of people. We had to make some difficult decisions. Transocean had to make some difficult decisions, whether it made those decisions correctly or incorrectly. There's no evidence that Transocean made those decisions because of Mr. McMichael's speech. All right. Thank you, Mr. Pugetson. Mr. Adelman, you have rebuttal? Just in terms of, I think the question was asked about the other two pushers, the three others that they contend Mr. McMichael should be compared with. Mr. Schneider was 26 years younger than Mr. McMichael, and Mr. Lawless is 12 years younger than Mr. McMichael. And Mr. Schneider and Mr. McMichael both had a 71 percent on the high grading process. So, any way you look, Mr. McMichael, who allegedly is being released because he had this, because of Mr. Kennedy's decisions based on what we contend is hearsay, once again, it just doesn't hold up to scrutiny. And I agree that Mr. Kennedy was the one who made the decision, but Mr. Kennedy made the decision either on statements that are in conflict with the 2014 evaluation or based on his true lack of knowledge as to what went on in that rig. I know he made, he was there less than one percent of the time. His office was in Houston at a desk and he claims he relied on Mr. Blanchett and Mr. Mosley for these statements, but why would they give statements that are totally in contradiction to the 2014 evaluation? The other issue in answer to Your Honor's question about defending the decision of the lower court, the lower court really never took issue with the way that Mr. McMichael was shoehorned into his termination. They, the lower court, set up a standard where Mr. McMichael was supposed to show that there was no reason that the economic downturn and the layoffs, that there was no reason for his termination. But that's inconsistent with Tyler versus Lazy Boy. They, there was never in this case, as it applies to Robert McMichael, a neutral objective criterion for his selection. It was based on, it was based on the most subjective concepts and weak leadership. How can someone have, be a weak leader when in his evaluation it said that he has a natural ability to rally the crews? I submit that we're here on looking at summary judgment. I submit that in this case, it's really unfair to Mr. McMichael and not justified for the lower court to have granted summary judgment. The lower court did not look at the evidence in the light most favorable to Mr. McMichael. It did not grant inferences to Mr. McMichael. The lower court weighed the evidence, weighed the credibility, and contrary to that iron decision, the lower court relied on statements, which I don't believe are admissible in court, hearsay statements that Mr. Kennedy set forth. What are the fact issues that you say, you know, remain that are most probative of the age animus? Whether Mr. McMichael was a mediocre tool pusher or whether or not he was a good tool pusher. Whether Mr. McMichael was a mediocre tool pusher or whether Mr. McMichael had the ability to lead and rally his crew. Whether Mr. McMichael was a mediocre tool pusher or whether or not he had a good ability to solve problems at the well site. Well, here's my problem with that. The point is what was Kennedy told, not what was true. Was Kennedy told by somebody, some people on the rig, that he was mediocre or that compared to the others on the rig, he was mediocre? What was Kennedy told, not what was true, but what was Kennedy told? The only thing that, we only know what Kennedy says he was told, but what Kennedy says he was told is in direct contradiction to the... Did you depose the people that Kennedy said told him these things? No, we did not depose them, nor did the company, but we relied on the 2014 evaluation, which is in direct contradiction to what Kennedy said he was told. And the 2014 evaluation is a business record that can come into evidence. After the fact, he says he was told certain things, and do you have any evidence that that's not true? Only that we have the 2014 evaluation. That's the only evidence that... Even, you don't, you have nothing to show that he, here's his evaluation, plus three people told him X, Y, Z, and he balanced that and took the more current information. I mean, where's the fact issue there? The fact issue is because he says that he was told they were mediocre, that Mr. McMichael was a mediocre tool pusher. Well, it seems to me you've got to put in evidence that he was not told that, not the question was he a mediocre tool pusher, but what Mr. Kennedy was told. But if he was, but what Mr. Kennedy made, why would he not take into consideration the evaluation? This was early in 2015 when he was looking at Mr. McMichael, and why wouldn't that be relevant? Why wouldn't his evaluation be relevant? I'm sure it's a factor, but my point is, I think you're from the wrong fact issue. I assume that there are real fact issues in this case, and that, you know, I can't say how they would be determined, but there are real fact issues in this case. Well, my question to you, tied to that wasn't so much what fact issues are in the case, but what are the fact issues, from your stand, are most probative of your burden to prove age animus, not fact disputes over the process and so forth. From what I read, you or your client didn't challenge his scores and so on and so forth, and even assuming they say they had an imperfect system, but that alone doesn't seem to, under the law, get you where you need to be. So I was just trying to, in my leaving point, to say what the fact issues that you said are most probative of the burden you have to make the age animus connection. That's what I was asking, not sort of the other. Do you understand what I'm asking? The fact issues that I see is that if these factors are not correct, that if the evaluation is correct and it's stripped away, then the fact issue is, was McMichael replaced by a younger, less qualified individual? They riffed people who were younger as well in the total riff, so just showing their rating was not perfect or whatever, just how does, under the case law, how does that get you? What's probative about that on the age? I mean, merely, you agree, you just, you can't just show that somebody who was hired later was younger. That alone doesn't get you to prevail, right? Correct, but we have Reeves, and if you strip, if you strip the company of its explanation, if the explanation is so, conflicts with the existing evidence, and you remove that, then all you're left with is an older man being replaced by a younger man.